UNITED STATES *v.* M. S. COWEN & Co. (No. 4460)[1]

[1] C. A. D. 283.

United States Court of Customs and Patent Appeals, June 19, 1944

*Paul P. Rao*, Assistant Attorney General (*Charles J. Miville* and *Sybil Phillips*, special attorneys, of counsel), for the United States.

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for appellee.

[Oral argument April 4, 1944, by Mr. Miville and Mr. George R. Tuttle]

Before Garrett, Presiding Judge, and Bland, Hatfield, Lenroot, and Jackson, Associate Judges [2]

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Third Division, sustaining the claim in appellant's protest that the merchandise is entitled to free entry.

The merchandise consisted of fifty thousand pounds of shelled peanuts which, packed in bags, were shipped, under a through bill of lading, directly from the Philippine Islands and entered at the port of Los Angeles, Calif., the entry being made April 1, 1939.

The entry appears to have been made upon a somewhat informal invoice in which it was stated that the merchandise consisted of "500 bags Shelled Peanuts, 50,000 lbs @ $.056 per lbs FOB $2800.00." An agent of the importer certified to the correctness of the invoice and stated in his certificate that at that time (April 1, 1939) no other invoice was available. So far as the record shows, no other invoice was ever filed. On the back of the "CONSUMPTION ENTRY" sheet under the heading "MISSING DOCUMENTS" are listed "Certificate of Origin" and "Through Bill of Lading." From the paper entitled "SUMMARY OF ENTERED VALUE, EXAMINATION, AND APPRAISEMENT," to which summary the invoice is attached, it appears that examination and appraisement (the latter at a value of $2,800 U. S. money) were made April 13, 1939, and, on the invoice there is the notation written with red ink, "Shelled peanuts, Product of the Philippines. Sec. 301 Free if regulations complied with." It appears from the testimony of certain customs officials given during the trial of the case that the notation was made by an acting examiner and was accepted and returned by the appraiser as his (the appraiser's) advisory classification.

It further appears from the record that the through bill of lading, which is required by the statute hereinafter quoted, was filed April 20, 1939, and that the certificate of origin, which is required by the customs regulations (see articles 260 (c) and 382 (d) Customs Regula-

---

[2] LENROOT, Judge, sat during the argument of this case, but resigned before the opinion was prepared.

tions of 1937), was filed April 18, 1939. The entry sheet is stamped "Liquidated Jul 24 1940." As liquidated, the duty assessed and collected was $3,500.

In the certificate of origin the Philippine exporter stated that "said merchandise contains foreign materials to the value of fifteen (15) per cent of the total value thereof"; that "said foreign materials consist of Peanuts from Java," and that "no claim for drawback of customs duties has been or will be made thereon." The certificate of the deputy collector of customs at Manila, P. I. (which is a part of the certificate of origin), states:

I Hereby Certify that I have investigated the foregoing statements and am satisfied that they are correct; that said merchandise is the growth or product of, or manufactured in, the Philippines; that none of the articles described which contain foreign materials contains such foreign materials exceeding in value twenty per centum of the total value of the articles; and that no drawback of customs duties has been paid and no entry for drawback filed thereon. The peanuts contains foreign material to the value of 15%.

I Further Certify that said articles have been entered for direct shipment to the United States, under a thorough [sic] bill of lading, and that they are entitled to free entry into the United States under the provisions of the United States Tariff Act of 1930, upon compliance with the requirements established by the Secretary of the Treasury for the admittance of Philippine products into the United States free of duty.

It is assumed that the certificate of origin (since it was not filed until April 18, 1939) was not before the acting examiner or the appraiser at the time of the examination, appraisement, and advisory classification on April 13, 1939, and, so far as the record shows, there was nothing in the papers which were before them showing that any portion of the merchandise was grown elsewhere than in the Philippine Islands.

A deputy collector of customs at the port of Los Angeles, Calif., was called as a witness by the Government and testified, in substance (basing his testimony on the papers), that the collector "ignored" the advisory classification of the appraiser and classified the peanuts "for duty at 7 cents a pound under paragraph 759 of the [1930] Tariff Act," basing his action on "The information contained on the Certificate of Origin." This testimony is all that the record discloses as to the reason for the collector's action. The fair assumption is that the particular "information" so referred to was the statement relative to the presence in the merchandise of the Java grown peanuts which were indiscriminately commingled in the bags with the Philippine grown peanuts.

Paragraph 759 of the Tariff Act of 1930 reads:

Par. 759. Peanuts, not shelled, 4¼ cents per pound; shelled, 7 cents per pound; blanched, salted, prepared, or preserved, not specially provided for, and peanut butter, 7 cents per pound.

In its protest appellee made alternative claims, only two of which need be stated here. These two were alleged in the protest as follows:

The peanuts are free of duty under section 301 [Tariff Act of 1930]; or that portion of the peanuts which were of Philippine origin are free of duty under that section and section 508 [Tariff Act of 1930].

Section 301 of the Tariff Act of 1930 is in the nature of a reciprocal tariff statute whereby provision is made for the admission free of duty of certain merchandise imported from the Philippine Islands into the United States, and of certain merchandise when exported from the United States into the Philippine Islands. The provisions here material read as follows:

There shall be levied, collected, and paid upon all articles coming into the United States from the Philippine Islands the rates of duty which are required to be levied, collected, and paid upon like articles imported from foreign countries: *Provided*, That all articles, the growth or product of or manufactured in the Philippine Islands from materials the growth or product of the Philippine Islands * * * which do not contain foreign materials to the value of more than 20 per centum of their total value, upon which no drawback of customs duties has been allowed therein, coming into the United States from the Philippine Islands shall hereafter be admitted free of duty: * * * *And provided further*, That the free admission, herein provided, of such articles, the growth, product, or manufacture * * * as hereinbefore defined, of the Philippine Islands into the United States, shall be conditioned upon the direct shipment thereof, under a through bill of lading, from the country of origin to the country of destination * * *.

Section 508 of the act relating to the commingling of goods reads:

Whenever dutiable merchandise and merchandise which is free of duty are merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

The trial court after a comprehensive review of the evidence, held, first, that "the commodities herein involved are 'articles' within the meaning of that term in section 301, *supra*," second, that "the shipment is far within the statutory requirement of products coming into the United States from the Philippine Islands containing no more than 20 per centum in value of foreign materials," and sustained the first claim in importer's protest, rendering judgment that the entire shipment is entitled to free entry under the first proviso in section 301, *supra*.

Briefly stated, the contention of the Government is that the shipment consisted of Philippine articles commingled with Javanese articles; that it was not the intention of Congress in enacting section 301, *supra*, to permit the free entry of foreign articles when commingled

with Philippine articles, and that the Java grown peanuts, subject to duty, were so commingled with the Philippine grown peanuts entitled to free entry that the quantity or value of each class could not be readily ascertained by the customs officers, and hence by the provisions of section 508, *supra*, the entire shipment was subject to the duty provided in paragraph 759, *supra*, as held by the collector.

We quote the following from the Government brief:

Section 301 of the Tariff Act of 1930 accords free entry to three classes of merchandise, as follows:

1. Articles the growth of the Philippine Islands.
2. Articles the product of the Philippine Islands.
3. Articles manufactured in the Philippine Islands from materials the growth or product of the Philippine Islands, or the United States, or both, which do not contain foreign materials in excess of 20 per centum.

The purpose of this provision is to permit free entry to merchandise, grown, produced, or manufactured in the Philippine Islands, from American or Philippine material, or to articles so produced or manufactured, to which foreign materials not in excess of 20 per centum of the value of the completed merchandise have been added in the making. It was not intended to extend to articles of foreign origin which had merely been commingled with articles of Philippine origin, the benefit accruing to *an article* coming from the Philippines. The distinction between duty-free and dutiable articles is the difference between an article produced or manufactured in the Philippine Islands containing foreign materials, and Philippine articles commingled with similar foreign articles. The former conveys the meaning of an article composed of materials or ingredients which have lost their identity and have become absorbed or merged in the article which they constitute. The materials of which the article is composed are the ingredients it contains.

The use of the word "contain" in the first proviso of section 301 of the Tariff Act of 1930 is indicative of the fact that Congress did not intend that a mere mixture of two or more like articles would be entitled to free entry. While this word has not been judicially defined insofar as Section 301, *supra*, is concerned, the term has been construed by this Court and a Circuit Court of Appeals to mean that a material is contained in an article if it includes, embraces, or forms part of the article. *United States* v. *Meadows & Co.* (1915), 5 Ct. Cust. Appls. 532, T. D. 35177; *United States* v. *Renken & Yates Smith Corp.* (1936), 24 C. C. P. A. (Customs) 265, T. D. 48687, and *United States* v. *R. C. Boeckel & Co.* (1915), 221 Fed. 885. Clearly, then, an article containing diverse materials is none of the components of which it is composed, but is a new article, differing from any one of its ingredients.

Decision of the controversy requires, in the first instance, construction of the phraseology "all articles, the growth or product of or manufactured in the Philippine Islands from materials the growth or product of the Philippine Islands   *   *   *   ," and in construing it consideration must be given to the meaning of the term "articles" as used in section 301, *supra*. The word "articles" has a broad common meaning. It properly may be applied to every physical object whether such object results from the processes of nature, or from the work of man. It has been used in tariff acts of the United States since the beginning of legislation respecting customs duties, and its meaning in many such

acts has been the subject of controversy, litigation, and judicial decision. Obviously, when used in tariff acts it may not always be given its broadest meaning as applied in common usage. It may not be treated as standing alone, but must be considered in its relationship to the merchandise in connection with which it is used.

It is true that every individual peanut (a natural growth and in that sense a product) involved in the importation at issue was an article, but every individual peanut was not the growth or product of the Philippine Islands, and it is our view that the proper construction of the term "growth," as used in the statute, requires that the individual articles of growth be considered. We are unable to agree that by mixing the peanuts in bags, or otherwise, the mixture thereby became the growth or product of the Philippine Islands within the meaning of the statute.

The term "product" like the term "article" has a broad meaning. It may apply to a natural object, as, for example, a peanut, or it may apply to a manufacture. In applying it, as it is used in the statute before us, the nature of the object or article involved must be considered. In some instances, it may be synonymous with an article embraced in the term "growth." In other instances, it may be synonymous with a manufacture and its meaning must be determined accordingly.

If, for example, the mixed peanuts here involved had been made into peanut butter in the Philippine Islands, such peanut butter, apparently, would have fallen within the scope of the language "product * * * manufactured in the Philippine Islands from materials the growth or product of the Philippine Islands * * * which do not contain foreign materials to the value of more than 20 per centum of their total value," and would have been entitled to free entry.

We do not think, however, that the quoted provision, applicable to manufactures, relates back to products of growth in their natural state, so as to permit free entry to a *mixture* such as that here involved, and we, therefore, must disagree with the trial court's construction of the statute in that regard.

The second question in the case relates to the claim embraced, as an alternative, in importer's protest, the meaning of which is that, even if it be held that the *entire* importation of peanuts was not entitled to free entry, such of the peanuts as were grown in the Philippine Islands were entitled to free entry and that duty should have been assessed only on those grown in Java.

Under the trial court's construction of the language of section 301, *supra*, it evidently did not deem it necessary to pass upon that question. We must, therefore, pass upon it *de novo*. So to do requires consideration of section 508, *supra*

The decision of the collector, of course, is the basis upon which this controversy has proceeded. Such decision is made presumptively correct by statute, and the burden of overcoming it rests upon the party contesting it. Implicit in the collector's decision is the finding that in merchandise containing portions entitled to free entry and portions not entitled to free entry, the portions were "so packed together or mingled that the quantity or value" of the respective portions could not be "readily ascertained by the customs officers." He, therefore, assessed upon the whole importation the rate of duty applicable to that part subject to duty, as provided in section 508, *supra*.

Appellee (the importer) contends, in substance, that the "quantity or value" of the respective classes of peanuts in the mixture could have been "readily ascertained by the customs officers."

To support this contention certain evidence was introduced to the effect that importer caused samples to be taken from some of the bags and forwarded for examination to one Mr. Arthur Rudde, who was engaged in business as a peanut broker at San Francisco, Calif.

The record, although somewhat hazy on the point, indicates that samples may have been taken from some twelve or thirteen of the five hundred pound bags and that the samples were put in packages whose weight ranged from two to five pounds. There is no definite showing of the time when the samples were taken from the five hundred pound bags. It appears from Mr. Rudde's testimony that he probably examined five or six of the sample packages, but he made no written notes of the result of his examination and testified from memory. Apparently, he had no personal interest in the outcome of the case and his qualifications as an expert on the matter of types and grades of peanuts is not questioned.

In explaining the difference between peanuts grown in the Philippines and those grown in Java he stated:

The Philippine peanut is a little blunt peanut. It has a very light skin, whereas the Java peanut has a dark skin. The Philippine peanuts are round, somewhat like our Spanish peanut, whereas the Java peanut is more consistently with a blunt end. The Philippine peanut is not uniform in size, whereas the Java peanut is.

At another point he stated:

The Philippine peanut is not as dark, the skin is not as dark, as the Java peanut. The Philippine peanut is brighter. It does not have as much oil and moisture content as the Java peanut has.

In respect to his method of segregating the peanuts, Mr. Rudde testified that he would have "to separate each peanut from the other," and, with respect to the time required for so segregating five pounds of peanuts, said: "I would say it would take 15 to 30 minutes."

If it requires at least fifteen minutes to segregate the peanuts contained in a five-pound sample, obviously it would require many hours to "separate each peanut from the other" in whatever quantity was necessary for a test in the large shipment at bar, and in so stating we are not holding that this is to be regarded as the proper rule in determining the amount of free and dutiable goods when commingled as were those here involved.

The contention is made on behalf of appellee to the effect that it was not necessary for the customs officers to go through the entire importation peanut by peanut in order to ascertain the quantity or value of the respective classes, but that such could have been readily ascertained from an examination of small quantities drawn from the shipment as samples. In its brief it is said:

Appellee's testimony showing the simplicity of segregation stands unchallenged, and it is obvious therefrom that any person could segregate a representative sample of these peanuts after receiving a few minutes' instruction as to the distinctive characteristics of each.

The brief for appellee then cites a number of decisions, the one principally relied upon being that in the case of *United States* v. *M. J. Brandenstein & Co.*, 17 C. C. P. A. (Customs) 480, T. D. 43941, which involved the duty assessment made by the collector under the Tariff Act of 1922 upon an importation of rice which importation included a mixture of "milled rice," dutiable at 2 cents per pound, and "broken rice," dutiable at one-half of 1 cent per pound. The quantity of broken rice was found to have been at least 10.1 per centum of the whole. The collector had applied section 507 of the Tariff Act of 1922, prototype of section 508 of the Tariff Act of 1930, *supra*, and assessed duty upon the entire importation at the rate of 2 cents per pound, the rate fixed for milled rice.

Our decision was to the effect that the customs officers could have readily ascertained the quantity or value of the respective classes of rice upon the basis of samples of the mixture, small in quantity, but conforming with a test, or standard, prescribed by the Government and employed by the trade.

The decision in that case is not regarded as controlling here. It is not shown that the Government had any prescribed test, or standard, applicable to merchandise such as that at bar, nor is it shown that any test, or standard, had ever been employed by the trade with respect to such merchandise.

Upon the record presented we would not be justified in holding that the customs officers could have *readily* ascertained "the quantity or value of each class" of peanuts contained in the shipment. Appellant's alternative claim, therefore, must be denied.

The decision of the United States Customs Court is *reversed*.